IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION

NICK LOPEZ, Individually and as
Administrator of the Estate of
Rigoberto Lopez-Alvarado                                   PLAINTIFF

v.                          No. 2:10-cv-44-DPM

UNITED STATES OF AMERICA                          DEFENDANT

AND

NICK LOPEZ, Individually and as
Administrator of the Estate of
Rigoberto Lopez-Alvarado                                   PLAINTIFF

v.                          No. 2:10-cv-76-DPM

T.C. OUTLAW; JERRY CISSELL;
TRACY GUTHRIE; MARK TIPTON;
TIM MOORE; JUAN BALTAZAR;
JEREMY LLOYD; DARYL LLOYD;
LT. MARK SHELDON; LT. JOHN ELAM;
CAPT. DARYL MAUNE; PALMER
HERRINGTON; STERLING AKINS; DARRELL
ORDWAY; TONYA GEROR; and ALAN MINGO,
in their individual capacities                           DEFENDANTS

## ORDER

Rigoberto Lopez–Alvarado was a casualty of gang violence at the

medium-security Federal Correctional Institute in Forrest City, Arkansas. He

was severely beaten on 19 June 2007. It was his first day in general population. He was attacked within his cell by members of the Barrio Aztecas gang who entered after the doors were opened for evening chow. Rigoberto died a few days later. He was a member of the Tango gang, and he had been transferred to Forrest City along with dozens of Tangos and members of the rival Mexikanemi gang after a gang riot at FCC Beaumont.

Nick Lopez, on behalf of himself and Rigoberto's estate, brought these companion cases: 2:10-cv-44-DPM, a Federal Tort Claims Act suit against the United States for the alleged negligence of prison guards and officials, and 2:10-cv-76-DPM, a *Bivens* action against the guards and officials directly for alleged deliberate indifference to Rigoberto's right to be protected from attack. The Court has managed the case under a joint scheduling order. All defendants have moved for summary judgment. Most material facts are undisputed. The Court takes the genuinely disputed facts in the light more favorable to Lopez. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*).

**1. Federal Tort Claims Act.** Lopez asserts that the United States is liable because its employees at FCI Forrest City failed (1) to monitor

-2-

surveillance cameras; (2) to separate Rigoberto, a nonviolent inmate, from violent inmates; (3) to classify and house inmates appropriately; (4) to staff the facility adequately to the risk of danger; (5) to conduct adequate visual checks to protect Rigoberto; (6) to intervene in Rigoberto's beating; (7) to physically confine the inmates who beat Rigoberto before the beating; (8) to correct negligent conduct by prison staff that had resulted in previous assaults; (9) to take reasonable steps to prevent the "checking of chains" and other violent confrontations of new inmates; and (10) to summon medical assistance in a prompt and appropriate manner; and (11) by deviating from prison policy and recognized penological standards in failing as described above. *44 № 1 at ¶ 23.*

The United States moves for summary judgment on two grounds: that Lopez has not made a negligence case on the facts; and that the Court lacks jurisdiction anyway because any negligent act fits the discretionary-function exception to the FTCA. *44 № 44 & 45.* The Court takes the jurisdictional argument first.

---

*The docket is indicated by the leading number: 44 is the FTCA case; 76 is the *Bivens* case.

The FTCA disallows claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government[.]" 28 U.S.C. § 2680(a). This exception is broad.  It covers decisions made at the planning and operational levels. *United States v. Gaubert*, 499 U.S. 315 (1991).  And if no statute, regulation, or agency directive requires a government agent to take a specific course of action in a given situation, the courts presume the agent exercises his discretion with policy in mind. *Dykstra v. United States Bureau of Prisons*, 140 F.3d 791, 795–96 (8th Cir. 1998).

There is a general statute requiring the BOP to protect prisoners. 18 U.S.C. § 4042(a)(3). But Lopez has produced no specific mandate, binding or advisory, governing any of the deficiencies he identifies.  Many — claims 2, 3, 4, 7, 8 & 9 — facially implicate policy-based decisionmaking. *E.g., Santana-Rosa v. United States*, 335 F.3d 39, 44 (1st Cir. 2003) (inmate classification and staff allocation are discretionary acts).  Claim 11 is cumulative and superfluous. Claim 1 — that prison officials failed to monitor surveillance video — also falls to the discretionary-function exception. The evidence is that there were many more cameras than monitors.  The official who watched the feeds, Darrell

Ordway, made a policy-based decision on which feeds to watch. *76 № 89* (Ex. 20). Even if he abused that discretion — and the Court sees no evidence that he did — the Court lacks jurisdiction to hear the claim. 28 U.S.C. § 2680(a).

That leaves Claims 5, 6, and 10. Claim 5 — that prison officials failed to conduct adequate visual checks — also fails. Prison policy assigned one housing officer per pod. Jerry Cissell was the housing officer in pod A-2 the day of the beating that killed Rigoberto. *44 № 53–1 at 8*. Lopez alleges that Cissell "failed to watch [the] inmates (and/or exited the pod entirely) for several minutes before the brutal battery, and for some 37 minutes after [Rigoberto] was laying on the floor of his cell, bleeding profusely and suffering the effects of severe head trauma and other injuries." *76 № 108 at 3*.

The surveillance video Lopez introduced does not support his allegations that Cissell abandoned the pod. Cissell appears at minutes 1:43, 13:20, 13:35, 14:00, and 22:50. He is not clearly shown again until minute 46, when Rigoberto's cellmate fetched Cissell and reported the assault. *44 № 54* (second video). But Cissell had more than 100 inmates in his charge. *44 № 53–1 at 9*. Many or most were free to move about the pod and between the

pod and the chow hall. *44 № 53–11 at 19– 22.* Cissell's decision about which inmates to watch at any moment was a discretionary act within the FTCA exception.

Claims 6 & 10 fare no better. Claim 6 — not intervening sooner — fails under ordinary negligence principles. Assuming that Cissell was bound to intervene in an inmate assault, his duty to do so cannot have arisen until he knew or should have known the assault was taking place. "[T]here is no negligence in not guarding against a danger which there is no reason to anticipate." *Ethyl Corp. v. Johnson*, 345 Ark. 476, 482, 49 S.W.3d 644, 648 (2001). "[A defendant] is not required to take precautions against a sudden attack from a third person which he has no reason to anticipate, or to give aid to one whom he has no reason to know to be ill." RESTATEMENT (SECOND) OF TORTS § 314A cmt. e. There is no proof Cissell did know or should have known. The attack took place in a cell with the door closed. *44 № 54* (video) at 7:03–9:06. Cissell denied that he knew of any special risk to inmates newly introduced to general population. *44 № 53–1 at 27–28.* Rigoberto himself identified no reason he should not have been introduced into general population. *E.g., 76 № 85–11 at 2.*

-6-

Claim 10, for "[f]ailing to summon medical assistance in a prompt and appropriate manner," fails too. *44 № 1 at 5.* A nurse arrived three minutes after Rigoberto was found injured. *E.g., 44 № 46–8* (Ex. 33). The lieutenant who accompanied the nurse immediately radioed a request to call an ambulance, which arrived less than 20 minutes later. *Ibid.* All officials acted in compliance with the BOP's multi-step policy for summoning outside help in medical emergencies. *76 № 89 at 2* (Ordway sealed affidavit), *44 № 48* (Ex. 41), *Program Statement at § 570.41(d).* And they did so promptly. No reasonable factfinder could find negligence on this record. "The mere fact that an . . . injury occurred, with nothing more, is not evidence of negligence on the part of anyone." *Nichols v. International Paper Co.,* 279 Ark. 226, 230, 644 S.W.2d 583, 585 (1983) (quotation omitted). Further, there is no evidence that the brief delay, negligent or not, harmed Rigoberto.

**2. *Bivens* claims.** Lopez's claims against the employees individually are not subject to the discretionary-function exception, but require sufficient evidence to support a finding that officials acted with deliberate indifference, not mere negligence. Lopez's second amended complaint alleges deliberate indifference by various defendants to more than 18 enumerated risks.

-7-

Deliberate indifference requires Lopez to prove that Rigoberto was "incarcerated under conditions posing a substantial risk of serious harm." *Holden v. Hirner*, 663 F.3d 336, 341 (8th Cir. 2011)(quotations omitted).  He must also show that prison officials "knew of and disregarded an excessive risk to [Rigoberto's] health or safety." *Ibid.*

Lopez responds to the defendants' summary-judgment record with two surveillance videos and the depositions of Cissell and Lieutenant John Elam. The collected record, viewed favorably to Lopez, tells this story.

Rigoberto was a medium-security inmate at FCC Beaumont before he and others involved in a gang fight at that facility were transferred to the special housing unit at Forrest City Low. *76 № 85–3; 76 № 85–5; 76 № 103–1.* Officials at Forrest City interviewed the new arrivals, who were members of the Tango and Mexikanemi gangs. *76 № 85–11.*  A Forrest City investigator brokered a peace agreement between the leaders of those gangs. *Ibid.*  The leader of a third gang at Forrest City, the Barrio Aztecas, reported that his gang had no problems with the Tangos. *76 № 103–4.*  Lopez objects that the gang leaders' statements in these reports are hearsay.  The Court does not consider the statements for the existence of a peace agreement or the absence

of animosity between the gangs. Whether or not the statements were true, they formed part of the information Defendants had before acting. FED. R. EVID. 801(c); *United States v. Amahia*, 825 F.2d 177, 181 (8th Cir. 1987).

Forrest City officials transferred Rigoberto and four other Tangos into medium-security general population on 19 June 2007. He indicated there was no reason he should not be placed in general population. *76 № 85–6*. He entered unit A-2 shortly before the 4:00 p.m. count. *76 № 85–7*. The inmates in A-2 were released to chow after the count concluded at 4:35 p.m. *Ibid.* The surveillance video from that unit shows that three inmates entered Rigoberto's cell almost immediately after Cissell unlocked the cells, while Cissell had his back turned moving down the line. *76 № 110* (second video),* at 1:45. In the seven minutes that followed, inmates entered and left the cell while other inmates hung on the rail outside, appearing to watch television. Two men, apparently the attackers, left about nine minutes into the video. The men who beat Rigoberto were Barrio Aztecas. *76 № 103–10*. They had never been housed at FCC Beaumont. *76 № 105* (Ex. 41).

---

*This video is identical to the video filed in the FTCA action, *44 № 54*.

Outside the housing unit, in the yard, one of the Tangos transferred with Rigoberto approached Lieutenant John Elam to request protective custody. *76 № 85–22.* Elam asked the inmate to write out a statement. As that inmate was writing, the B-4 Housing Unit Officer referred a second inmate to Elam. *Ibid.* Elam realized upon seeing the second inmate that both had been in the group of Tangos transferred earlier that day. *76 № 109–2 at 21–22.* He called his Captain to report that he "[didn't] think this [transfer was] going to work[.]" *Id. at 21.* While Elam was on the phone, a third Tango approached Elam about entering protective custody. At the same moment, Elam heard Cissell issue an emergency medical call. *Id. at 22.*

The time was 5:05 p.m. *76 № 85–7.* Less than two minutes earlier, Cissell had become the first BOP employee to learn Rigoberto had been attacked. At 5:09, Lieutenant Sheldon arrived with a nurse and found Rigoberto gravely injured. *76 № 103–8.* Sheldon quickly asked for an ambulance, *ibid.,* and one was quickly called. The ambulance arrived at 5:26 and Rigoberto passed out of the care of the parties to this suit. *Ibid.* He died three days later at a hospital in Memphis. *76 № 103–9.*

-10-

**3. Resolution.** The Court declined to reach the merits early in the case because of the seriousness of the allegations and the injury, as well as the uncertainty about the facts. Rigoberto's murder in prison so soon after he entered general population raised red flags. But the parties now have all the facts before them. And in light of those facts, no reasonable jury could find that deliberate indifference by any defendant contributed to Rigoberto's death. A few points stand out.

First, there is no evidence that anyone at Forrest City should have foreseen danger to Rigoberto from the inmates who beat him. Indeed, the attackers themselves did not foresee killing him. *76 № 103–11.* The leader of the Barrio Aztecas had denied any animus toward the Tangos. Second, counsel for Lopez was unable to elicit any evidence for the theory that new inmates face a special danger when they are introduced into the general population. Without it, Lopez cannot say with any force that Cissell should have focused on the few inmates who stayed inside the unit instead of the many moving around the yard. And the summary-judgment record does not reflect any lengthy, substantial, and recent history of serious violence at Forrest City that might suggest deliberate indifference to the risks an average

-11-

prisoner there faced. Third, officials did not learn there was a problem until after Rigoberto had been attacked. And officials acted quickly thereafter; Lieutenant Elam was trying to call back the transfer when the medical alert came through. Finally, while Lopez suggests that Officer Cissell would have heard Rigoberto moaning if he had stayed in the unit, there is no evidence that anyone heard moaning before Cissell ascended the stairs to Rigoberto's closed cell. The surveillance video shows several inmates walk past the cell after the attack without pausing, looking, or otherwise indicating anything was amiss. *76 № 110* (second video) at 27:38, 33:00, 33:20, 35:30, 43:52, 44:26. The record does not allow a reasonable inference either that Rigoberto was moaning or, if so, that anyone in the pod could have heard him. *Moore v. Indehar*, 514 F.3d 756, 758 (8th Cir. 2008)(the nonmovant is entitled to all reasonable inferences from the facts).

Motions for summary judgment, *44 № 44* and *76 № 101*, granted. Lopez's complaints are dismissed with prejudice.

So Ordered.

D.P. Marshall Jr.
United States District Judge

5 April 2013

-12-